UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

A Slice of Pie Productions, LLC,    :
    Plaintiff,                   :
                                  :
v.                                  :    Case No. 3:04cv1034 (JBA)
                                  :
Wayans Brothers Entertainment,      :
et al.,                             :
    Defendants.                  :

RULING ON MOTIONS FOR SUMMARY JUDGMENT [DOCS. ## 96, 107]

The Fifth Amended Complaint of plaintiff A Slice of Pie

Productions, LLC ("Slice of Pie") asserts a claim of copyright

infringement under the federal Copyright Act against defendants

Revolution Studios, LLC ("Revolution") and Sony Pictures

Entertainment, Inc. ("Sony") and a claim of breach of implied

contract against defendants Wayans Brothers Productions ("WBP")

and Gold/Miller Company ("Gold").  See Fifth Am. Compl. [Doc. #

76].[1]  Familiarity with the Court's previous rulings on motions

to dismiss, see [Docs. ## 61, 87], is presumed.  Defendants now

move for summary judgment, contending, inter alia, that with

respect to the Copyright Act claim, there is no evidence

supporting an inference that defendants copied plaintiff's

screenplay or of unlawful appropriation (shown by substantial

_____

    [1] In its complaint, plaintiff names defendants as Revolution
Studios, Inc., Sony Pictures Entertainment, Wayans Brothers
Entertainment, and the Gold/Miller Agency, respectively.
Defendants have identified themselves as the parties named above.

1

similarity between plaintiff's screenplay and defendants' film) and, with respect to the implied contract claim, that it is preempted by the Copyright Act, that there is no evidence of a shared understanding of payment for use, and that there is no evidence of actual use. <u>See</u> Revolution/Sony/WBP Mot. [Doc. # 96]; Gold Mot. [Doc. # 107]. For the reasons that follow, defendants' Motions will be granted.

**I.    Factual Background**

The facts relevant to this ruling are as follows, and are undisputed unless otherwise noted. In 1997, Jon Coppola, Jason Coppola, and Mario Pittore, the three principals of Slice of Pie, wrote and copyrighted a screenplay entitled <u>Johnny Bronx</u> about an African American FBI agent who disguises himself as a white Italian American in order to go undercover and infiltrate the Mafia. In 1998, they registered <u>Johnny Bronx</u> with the Writer's Guild of America and later registered it with the United States Copyright Office (Registration Number TXu-194-165).

In October 1999, plaintiff submitted (through its former agent Ron Singer, now deceased) a copy of the <u>Johnny Bronx</u> screenplay to agent Lisa Blum at the defendant Gold/Miller Company, a talent management company and agent for Keenan Ivory Wayans, Shawn Wayans, and Marlon Wayans, the principals of defendant WBP (a motion picture production company), to solicit interest by Marlon and/or Keenan Wayans. Another of plaintiff's

then-agents, Reuben Cannon (who plaintiff incorrectly states is now deceased) attests that Singer worked with plaintiff to find talent for the Johnny Bronx project, not to solicit purchasers for the idea in the script, and that he and Singer discussed that they had both been asked by plaintiff's principals to find such talent. Plaintiff contends that at the time it was also searching for purchasers of the project. At some time following the 1999 submission, a representative of Gold notified plaintiff that the Wayans brothers were not interested in the script.

Later, in July 2001, Lorrie Bartlett at the Gersh Agency (also representatives of the Wayans brothers) sent a copy of the Johnny Bronx screenplay to Blum for consideration by the Wayans brothers via letter stating "Per our conversation, enclosed please find the following scripts with their pertinent details: Johnny Bronx – Reuben Cannon is producing this script by Jason Coppola, Jon Coppola and Mario Pittore. This is not yet set up at a studio, see 7/25/01 Blum Letter [Doc. # 98, Ex G]; Blum testifies that she has no recollection of ever receiving or reading the screenplay, Blum Dep. [Doc. # 98, Ex. D] at 9-11, 13, 38, 40. On the same date, Bartlett also sent the script, attaching a nearly identical letter, to Rick Alvarez, a producer with WBP, see 7/25/01 Alvarez Letter [Doc. # 96, Ex. H]; Alvarez also states that he has no recollection of the submission and never read the screenplay, Alvarez Decl. [Doc. # 103] ¶ 31.

Plaintiff claims to have also sent the script to Marlon Wayans on July 30, 2001, with a letter stating "Per my conversation with Rick, enclosed please find the script for 'Johnny Bronx.' Reuben Cannon is producing this script by Jason Coppola, Jon Coppola and Mario Pittore. This is not yet set up at a studio. I look forward to hearing your thoughts," see 7/30/01 M. Wayans Letter [Doc. # 96, Ex. I], but Marlon Wayans never read the screenplay, M. Wayans Decl. [Doc. # 101] ¶¶ 20, 38. A Johnny Bronx character "wish list" listed Marlon Wayans as a desired actor to play the lead role of Isaac Byrd. See Johnny Bronx Wish Lists [Doc. # 96, Exs. J, K]. The other Wayans brothers behind WBP, Shawn and Keenen, also attest that they never received and never read Johnny Bronx. See K. Wayans Decl. [Doc. # 102] ¶ 20; S. Wayans Decl. [Doc. # 100] ¶ 22. However, due to potential dispute about which of the Wayans brothers' agents may have received and/or read the screenplay, defendants assume for summary judgment purposes that they had access to the screenplay. Nevertheless, defendants maintain that there is no evidence that there was any understanding on their behalf that plaintiff was submitting the screenplay for the purpose of selling any of the ideas therein. Plaintiff disputes this, referencing the affidavit of Jason Coppola in which he describes his understanding about the nature of the submissions. The sufficiency of this evidence will be discussed infra.

WBP, through its producers the Wayans brothers and Alvarez, claims that beginning in October 2001 it began to independently develop the White Chicks movie (ultimately released in June 2004). Specifically, it contends that in early October 2001, inspired by having just seen the 2001 film Legally Blonde, about a wealthy Caucasian sorority girl who attends Harvard Law School, Shawn Wayans telephoned Alvarez and told him his idea for a film in which he and his brother Marlon would portray Caucasian girls. See S. Wayans Decl. ¶ 6; Alvarez Decl. ¶ 6. Alvarez then told Shawn about an article in FHM magazine about Paris and Nicky Hilton and the fact that wealthy Caucasian girls were becoming a "big thing" in pop culture. Id. The next day, the two discussed with Marlon Wayans the idea of Shawn and Marlon playing undercover cops disguised as wealthy Caucasian girls. M. Wayans Decl. ¶ 6; S. Wayans Decl. ¶ 7; Alvarez Decl. ¶ 7. During the same conversation, they discussed the device used in many motion pictures of going undercover to accomplish a goal, of men dressing up as woman (such as in Some Like it Hot, Mrs. Doubtfire, and Big Momma's House) and of African American characters posing as Caucasian characters (such as in True Identity and The Associate). See M. Wayans Decl. ¶ 6; S. Wayans Decl. ¶ 7; Alvarez Decl. ¶ 7. Marlon and Shawn Wayans and Alvarez describe the process of developing the storyline of FBI agents who go undercover as socialite sisters to break up a

kidnaping ring in New York in which the villain was kidnaping the wealthiest young women in New York society, including enlisting the help of screen writers with whom they have previously worked, pitching the concept to representatives of Revolution Studios, and referencing Alvarez's notes of the process.  See K. Wayans Decl. ¶¶ 6-17; M. Wayans Decl. ¶¶ 6-18; S. Wayans Decl. ¶¶ 7-19; Alvarez Decl. ¶¶ 7-28 & Exs. A, B, C & D.  Shooting on White Chicks began in October 2003 and the film was released on June 23, 2004.  See K. Wayans Decl. ¶ 18; M. Wayans Decl. ¶ 19; S. Wayans Decl. ¶ 20; Alvarez Decl. ¶ 29; Garvin Decl. [Doc. # 99] ¶ 3.  Plaintiff filed suit the next day.

## II.  Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law."  Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002).  The duty of the Court is to determine whether there are issues to be tried and, in making that determination, the Court must draw all factual inferences in favor of the party opposing

the motion, viewing the inferences to be drawn from factual
disputes among materials such as affidavits, exhibits, and
depositions in the light most favorable to that party.  Phaneuf
v. Fraikin, 448 F.3d 591, 595 (2d Cir. 2006).  "If reasonable
minds could differ as to the import of the evidence . . . and if
there is any evidence in the record from any source from which a
reasonable inference in the nonmoving party's favor may be drawn,
the moving party simply cannot obtain a summary judgment."  R.B.
Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal
quotation, citation, and alteration omitted).  However, "[w]here
the record taken as a whole could not lead a rational trier of
fact to find for the non-moving party, there is no genuine issue
for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 586 (1986) (internal quotation and citation
omitted).

     In moving for summary judgment against a party who will bear
the ultimate burden of proof at trial, the movant's burden of
establishing that there is no genuine issue of material fact in
dispute will be satisfied if he or she can point to an absence of
evidence to support an essential element of the non-moving
party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23
(1986).  "A defendant need not prove a negative when it moves for
summary judgment on an issue that the plaintiff must prove at
trial.  It need only point to an absence of proof on plaintiff's

part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" <u>Parker v. Sony Pictures Entm't, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (quoting <u>Celotex</u>, 477 U.S. at 324); <u>see also</u> <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. <u>Matsushita</u>, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. <u>Id</u>. at 586 (citations omitted).

## III. Discussion

### A. Copyright Act Claim

Plaintiff's first count claims copyright infringement against Revolution and Sony for "copying, downloading, use,

modification, reproduction display and distribution of the
screenplay, including without limitation, the ideas, concepts,
theme, text and plot contained therein and all derivatives
thereof" in violation of the United States Copyright Act, 17
U.S.C. §§ 501(a), 106(1), 106(2), and 106(3).  <u>See</u> Fifth Am.
Compl., Count One.

As the parties agree, "[i]n a copyright infringement case,
the plaintiff must show: (i) ownership of a valid copyright; and
(ii) unauthorized copying of the copyrighted work."  <u>Jorgensen v.
Epic/Sony Records</u>, 351 F.3d 46, 51 (2d Cir. 2003).  Plaintiff's
satisfaction of the first element is not disputed.  "To satisfy
the second element of an infringement claim – the 'unauthorized
copying' element – a plaintiff must show both that his work was
actually copied and that the portion copied amounts to an
improper or unlawful appropriation."  <u>Id</u>. (internal quotation
omitted).

"Because direct evidence of copying is seldom available, a
plaintiff may establish copying circumstantially by demonstrating
that the person who composed the defendant's work had access to
the copyrighted material, . . . and that there are similarities
between the two works that are probative of copying."  <u>Id</u>.[2]

---

[2] The relationship between access and probative similarity
is an inverse one, "such that the stronger the proof of
similarity, the less proof of access is required . . . where the
works in question are so strikingly similar as to preclude the
possibility of independent creation, copying may be proved

9

However, even assuming ability to satisfy this first "copying" prong by a showing of similarities probative of copying, coupled with access, plaintiff's copyright claim cannot survive summary judgment because there is insufficient evidence of unlawful appropriation.

To prove unlawful appropriation, a plaintiff must be able to demonstrate a "substantial similarity of protectible material in the two works," with substantial similarity turning on "whether, in the eyes of the average lay observer, the [allegedly infringing work] [is] substantially similar to the protectible expression in the [allegedly infringed work]." Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996); accord Laureyssens, 964 F.2d at 141 ("The test for unlawful appropriation to prove infringement of another's copyright asks whether substantial similarity exists between the works at issue. . . . To that end, we determine in most cases whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.") (internal quotation omitted). "If 'the similarity concerns only noncopyrightable elements of plaintiff work,' or 'no reasonable trier of fact could find the works substantially similar,'

_____

without a showing of access." Id. at 56 (internal quotation omitted). As the defendants here assume access to plaintiff's screenplay for summary judgment purposes, however, the Court need not reach the issue of whether any similarity between the works could be characterized as "striking."

summary judgment is appropriate." <u>Williams</u>, 84 F.3d at 587

(quoting <u>Walker v. Time Life Films, Inc.</u>, 784 F.2d 44, 48 (2d

Cir. 1986)). The Second Circuit has noted that "[w]hen we

determine that a work contains both protectible and unprotectible

elements, we must take care to inquire only whether 'the

<u>protectible elements, standing alone</u>, are substantially

similar.'" <u>Id</u>. at 588 (citing <u>Knitwaves, Inc. v. Lollytogs Ltd.</u>,

71 F.3d 996, 1002 (2d Cir. 1995)) (emphasis in original).

Unprotectible elements include "<u>scenes a faire</u>, sequences of

events that 'necessarily result from the choice of a setting or

situation,' [which] do not enjoy copyright protection," <u>see id</u>.

at 587 (citing <u>Walker</u>, 784 F.2d at 50 ("Neither does copyright

protection extend to copyright or 'stock' themes commonly linked

to a particular genre."), and ideas, because "a copyright does

not protect an idea, but only the expression of an idea," <u>id</u>.

(citing <u>Kregos v. Associated Press</u>, 3 F.3d 656, 663 (2d Cir.

1993)).[3] To determine substantial similarity, the Court (on

summary judgment) or fact finder (at trial) "examine[s] the

similarities in such aspects as the total concept and feel,

theme, characters, plot, sequence, pace, and setting." <u>Williams</u>,

---

[3] <u>Accord</u> <u>Knitwaves</u>, 71 F.3d at 1002 ("[T]he Plaintiff must
show that the defendant appropriated the plaintiff's particular
means of expressing an idea, not merely that he expressed the
same idea. The means of expression are the 'artistic' aspects of
a work; the 'mechanical' or 'utilitarian' features are not
protectible.").

84 F.3d at 588.[4]

Here, as in <u>Williams</u>, most of the similarities evident from a comparison between the <u>Johnny Bronx</u> screenplay and the <u>White Chicks</u> film arise from uncopyrightable elements and concepts, including ideas (which are noncopyrightable) that had been used prior to the creation of either work and <u>scenes</u> <u>a</u> <u>faire</u>.  As set out by defendants and undisputed by plaintiff, the overall concepts underlying both works – FBI agents working undercover, African American characters disguising themselves as Caucasian characters, and men disguising themselves as women, were non-novel concepts used in the film industry long before plaintiff's authors drafted the screenplay (<u>e.g.</u>, in, respectively, <u>Miss Congeniality</u>, <u>The Associate</u> and <u>True Identity</u>, and <u>Some Like It Hot</u>, <u>Tootsie</u>, and <u>Mrs. Doubtfire</u>).  Neither is the theme of satirizing some component of social culture with exaggerated use

_____

[4] Plaintiff suggests that defendants' conceding access for summary judgment purposes is probative of or relevant to the 'substantial similarity' assessment, citing Ninth Circuit cases on its inverse ratio rule.  However, it is Second Circuit law that is applicable to plaintiff's copyright claim, <u>see</u> Ruling on Motions to Strike at 11 n.5, and while access may be relevant to the first prong of analysis (copying), with respect to the second prong (substantial similarity), the Second Circuit has rejected the Ninth Circuit's inverse ratio rule.  <u>See</u> <u>Arc Music Corp. v. Lee</u>, 296 F.2d 186 (2d Cir. 1961);  3 <u>Nimmer on Copyright</u> § 1303[D] (citing cases).  Thus, contrary to plaintiff's implication, defendants' assumed access to the screenplay is insufficient for a finding of substantial similarity and courts grant summary judgment to defendants on copyright claims even where access and/or actual copying is conceded.  <u>See</u> <u>Williams</u>, 84 F.3d 581.

of stereotypes (in <u>Johnny Bronx</u>, the Italian Mafia, and in <u>White Chicks</u>, wealthy fashion- and body-conscious socialites), remotely novel. Moreover, the plot of each work is markedly different – and, as noted above, it is not the idea behind a copyrighted work, but its expression, that is protected.

Taking the factors set out in <u>Williams</u> in turn, and even relying on those similarities identified in the expert report of Kenneth Danycger on which plaintiff relies for its substantial similarity analysis in its Opposition Memorandum, <u>see</u> [Doc. # 115] at 5,[5] when the Court parses out the unprotectible elements and <u>scenes</u> <u>a</u> <u>faire</u>, there is nothing left in the two works that could be found to be substantially similar.

<u>Total Concept and Feel</u>: While both works have elements of humor, <u>Johnny Bronx</u> is darker and more violent than the light-hearted, jokey, slapstick feel of <u>White Chicks</u>.

<u>Theme</u>: While both works concern African American men trying to "prove" themselves in the FBI, this idea is not a new one and the method of execution in each is different, with Isaac in <u>Johnny Bronx</u> being told that he is only an agent because of his father, and Kevin and Marcus in <u>White Chicks</u> trying to "prove" themselves in a less serious and more goofy way. Similarly,

---

[5] In the Court's Ruling on Motions to Strike, the expert report itself was struck for untimeliness. The Court refers to it here, however, because plaintiff relies on it in its briefing for the similarities that it claims a lay observer would detect between the two works.

while both works touch on racial issues and satirize elements of popular culture, the difference in is the details: <u>Johnny Bronx</u> confronts the race issues in a more serious way, with, for example, Isaac accurately predicting that he will receive more preferential treatment when disguised as a Caucasian man, while <u>White Chicks</u> plays on the stereotypes with, for example, Lattrel's obsession with Caucasian women and the so-called "white party"; <u>Johnny Bronx</u> takes a <u>Sopranos</u>-type look into stereotypes of the Italian Mafia, while <u>White Chicks</u> spoofs on wealthy socialites and their fashion-related and body-image issues. Moreover, another theme in <u>White Chicks</u>, playing on sexuality (with men disguised as women flirting with other women, such as also depicted in other films, <u>e.g.</u>, <u>Tootsie</u>), is not present in <u>Johnny Bronx</u> due to the obvious plot differences.

<u>Characters</u>: Any similarities in characters between the two works also do not arise from protectible elements and, moreover, what appear to be similarities on the surface reveal themselves as dissimilarities on closer inspection. For example, while Isaac, Kevin, and Marcus are all African American FBI agents fearing for their jobs, Isaac feels pressure to live up to the reputation of his father whereas Kevin and Marcus seek to redeem themselves from their botched undercover operation in a more lighthearted manner. While both works contain a jealous girlfriend/wife character who challenges the main character's

commitment to his work and questions his love for her, this is a common element in movies regarding life-work balance, and while Teresa in <u>Johnny Bronx</u> only questions Isaac's commitment to her over his job, Gina suspects Marcus of infidelity.  While both works include a claimed "unorthodox helper" who transforms the main characters into their undercover persona, that helper in <u>Johnny Bronx</u> – Dr. Darling, a smart attractive agent who uses state-of-the-art technology – is very different from lab technician Josh in <u>White Chicks</u> – a young dorky man who transforms the brothers into Caucasian girls with the help of makeup, wigs, and prosthetics.  Moreover, the existence of a character who assists in the disguise is necessitated given the nature of both works (there were similar characters in both <u>Miss Congeniality</u> and <u>Mrs. Doubtfire</u>, for example).  The "other woman" in each film is also dissimilar – Cecila in <u>Johnny Bronx</u> is the feisty daughter of the villain, Don Corto, whereas Denise in <u>White Chicks</u> is the lovely sophisticated journalist who helps Kevin crack the kidnaping plot and is really only a love interest, not an "other woman."  The villains, while generally more amusing than threatening as plaintiff claims, are different inasmuch as Don Corto in <u>Johnny Bronx</u> is an embodiment of an exaggerated stereotype of an Italian Mob boss, whereas Mr. Vandergeld in <u>White Chicks</u> is just a rich businessman whose identity as "villain" is not even revealed until the end of the

film.

     <u>Plot</u>: The plot in each film is perhaps the most dissimilar element.  While plaintiff, through Dancyger, claims that in both works the police plot is minor and neither tense nor engaging, with jokes superceding any dramatic development, the police plot and the theme of the main character proving himself, drive <u>Johnny Bronx</u> much more so than <u>White Chicks</u>.  Further, and more obviously, the premise of each film is entirely different – <u>Johnny Bronx</u> is about one African American man who infiltrates the Italian Mafia by disguising himself as an Italian through the use of state-of-the-art technology which creates synthetic skin, whereas <u>White Chicks</u> concerns two African American men who disguise themselves as Caucasian socialite sisters with the help of prosthetics, makeup, and wigs, to entrap a suspected kidnapper.  Additionally, while <u>Johnny Bronx</u> is more narrowly confined to the main plot of Isaac infiltrating the Mafia and the more minor plot of his relationship with his girlfriend and mother, <u>White Chicks</u> weaves many more plot lines together, including the main plot of Kevin and Marcus disguising themselves as the Wilson sisters and the subsidiary plots of Marcus' relationship with his wife, Kevin's flirtation with Denise, Lattrel's infatuation with Marcus disguised as Tiffany, the relationship between the two Copeland brothers, the relationship between the disguised brothers and the Wilson sisters' friends,

and the rivalry between the Wilson sisters and the Vandergeld
sisters.

Sequence: Plaintiff, through Dancyger, claims a similar
sequence in each work with three parts – the first depicting the
main characters failing at their jobs and on the verge of being
fired, the second during which the main characters transform
themselves into Caucasian characters, and the third plot-heavy
segment in which the main characters successfully stop the
crimes, save their jobs, and repair their romantic relationships.
This structure, however, is not unique, with the exposition
setting the scene and background of the main character, the
development of the plot, and the happy resolution.

Pace: Plaintiff claims that the pace of both works
incorporates a sketch comedy approach where the plot does not
drive the stop-and-start pace.  However, Johnny Bronx is much
less stop-and-start than White Chicks, with White Chicks
incorporating a greater variety of scenes and many more subplots
than does Johnny Bronx, as discussed above.  Moreover, "the pace,
without more, does not create an issue of overall similarity
between the works."  Williams, 84 F.3d at 590.

Setting: The settings of the works are also substantially
different.  Johnny Bronx is set primarily in slightly sketchy New
York City venues (such as the "Hairy Clam" club, a boxing arena,
a junkyard, a steam room), mostly in the Little Italy section of

the City, whereas White Chicks is primarily set at a fancy hotel in the Hamptons. While both works include scenes in FBI offices, such are scenes a faire necessitated by the nature of the plot of each film involving law enforcement. Cf., e.g., Walker, 784 F.2d at 50 ("Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx. These similarities therefore are unprotectible as 'scenes a faire,' that is, scenes that necessarily result from the choice of a setting or situation."). Moreover, while plaintiff claims that both works have their climactic conclusion (in which the main characters' true identities are revealed and the villain is apprehended) on a yacht, and although an earlier draft of White Chicks apparently did contemplate such a scene, the version of White Chicks which was released and which is the subject of the Fifth Amended Complaint concludes at a Hamptons fashion show, not on a yacht.

Plaintiff, through Dancyger, also lists a few other similarities, including those in the dialogue of both works, such as the girlfriend/wife character's use of the concept "the job or me!," similar belittling treatment of the main characters by other FBI agents, and the use of stereotype-appropriate slang. However, as the Second Circuit found in Williams, "such lists are inherently subjective and unreliable, particularly where the list emphasizes random similarities scattered throughout the works. .

18

. . Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." 84 F.3d at 590 (internal quotation omitted).

This is thus a case, like <u>Williams</u>, where "nearly all the similarities between the works arise from noncopyrightable elements," such as non-novel ideas and <u>scenes</u> <u>a</u> <u>faire</u> that flow from the uncopyrightable ideas, and "[o]nce one goes beyond [a] level of abstraction, the similarity in [<u>e.g.</u>,] themes [plots, scenes, and characters] disappears." <u>Id</u>. at 588-90. In fact, the premise, plot, and scenes depicted in each work is so dissimilar that no reasonable juror could find them to be substantially similar to support a conclusion of unlawful appropriation. Accordingly, summary judgment will be granted on this claim.[6]

B.   Breach of Implied Contract Claim

Plaintiff's state law claim for breach of implied contract seeks "compensation not for the actual written script, but for the idea[s] allegedly embodied in the script and shared with [defendants]," such industry-specific cause of action first being recognized in California in <u>Desny v. Wilder</u>, 299 P.2d 257 (Cal.

---

[6] In view of this conclusion, the Court does not reach defendants' independent creation argument.

1956).[7]  "To establish a <u>Desny</u> claim for breach of implied-in-fact contract, the plaintiff must show that the plaintiff prepared the work, disclosed the work to the offeree for sale, and did so under circumstances from which it could be concluded that the offeree voluntarily accepted the disclosure knowing the conditions on which it was tendered and the reasonable value of the work."  <u>Grosso v. Miramax Film Corp.</u>, 383 F.3d 965, 967 (9th Cir. 2004) (citing <u>Faris v. Enberg</u>, 97 Cal. App. 3d 309 (Cal. App. Ct. 1979)).[8]

Plaintiff's claim here cannot survive summary judgment because reasonable jurors considering the evidence could not conclude the existence of a "bilateral expectation of compensation," nor use by defendants of the ideas in the

---

[7] As determined in the Court's previous rulings and acknowledged by the parties, California law is applicable to this state law claim.

[8] Gold's argument that this claim is preempted by the Copyright Act is precluded by the Ninth Circuit's decision in <u>Grosso</u>, stating that "[t]o survive preemption, the state cause of action must protect rights that are qualitatively different from the rights protected by copyright: the complaint must allege an 'extra element' that changes the nature of the action" and concluding a claim for breach of implied contract which includes an allegation of "the bilateral expectation of compensation" constitutes the "extra element" that "transforms the action from one arising under the ambit of the federal statute to one sounding in contract." <u>Grosso</u>, 383 F.3d at 968.  Defendants' contention that there is insufficient evidence to establish such a bilateral expectation of compensation relates to the merits of their summary judgment motions seeking dismissal of the breach of implied contract claim, but does not establish preemption of the claim.

screenplay purportedly submitted to them by plaintiff.

The only evidence identified by plaintiff to support an inference of a shared understanding that the screenplay was being submitted for sale and that defendants accepted it as such, expecting that any use would be compensated, is the affidavit of Jason Coppola. Coppola's Affidavit, however, while advancing the plaintiff's "hope" and/or "expectation" that defendants would be interested in "either starring in or the production of a film based on the screenplay," Coppola Af. ¶ 17, does not support an inference that any of defendants actually shared Coppola's/plaintiff's understanding that "any use, development or exploitation of the screenplay, thoughts, ideas or concepts therein, would result in compensation for the [p]laintiff for the use thereof," id. ¶ 19, or that they accepted the submission on that basis. Moreover, all of the other record evidence is to the contrary, showing that defendants believed that the screenplay submission was being made in order to solicit the interest of one of the Wayans brothers in starring in the film, which the submission letters stated already had a producer attached to it (although it was not yet "set up at a studio"). See 7/25/01 Blum Letter; 7/25/01 Alvarez Letter; 7/30/01 M. Wayans Letter; Johnny Bronx Wish Lists; Cannon Decl. ¶¶ 4-5, 7-8; Bartlett Aff. ¶¶ 2-

6.[9]  See also Aliotti v. R. Dakin & Co., 831 F.2d 898, 902-03

(9th Cir. 1987) (affirming grant of summary judgment on

plaintiffs' claim for breach of implied contract where evidence

showed that plaintiff designer "made her presentation to

[defendant] not to sell her designs herself but to help persuade

[defendant] to buy [the company plaintiff worked with].  She

argues that she disclosed her ideas because she hoped to obtain

employment with [defendant], but no contract may be implied where

an idea has been disclosed not to gain compensation for that idea

but for the sole purpose of inducing the defendant to enter a

future business relationship"); Faris v. Enberg, 97 Cal. App. 3d

309, 318-19 (Cal. App. Ct. 1979) (affirming grant of summary

judgment on cause of action for implied-in-fact contract on the

basis that there was "absolutely no evidence that plaintiff

expected, or indicated his expectation of receiving compensation

---

[9] Coppola's attestation that during the same time period
plaintiff was seeking to sell the screenplay to other third
parties, see Coppola Aff. ¶ 23, is irrelevant both because there
is no evidence that defendants were aware of this fact and, as
discussed above, there is no evidence that plaintiff communicated
its hope or expectation to defendants regarding selling the
screenplay.  Similarly, with respect to claimed custom and
practice in the film industry concerning submission of
screenplays, plaintiff offers no evidence of such a custom and
practice (other than Coppola's unilateral, uncommunicated
"understanding" of "basic industry standard, custom and trade,"
see Coppola Aff. ¶ 21), nor of defendants' awareness or
understanding of it, and Desny, which recognized the cause of
action for breach of implied contract in the film industry, did
not mention or approve of reliance solely on industry custom and
practice for this purpose.

for the service of revealing the format [of plaintiff's contemplated television show] to Enberg.  To the contrary, the sole evidence is that plaintiff voluntarily submitted it to Enberg for the sole purpose of enabling Enberg to make a determination of his willingness to enter into a future business relationship [as  master of ceremonies for the show] with plaintiff," finding "[p]laintiff never intended to submit the property for sale and did not tell Enberg that he was submitting it for sale.  There is no reason to think that Enberg, or anyone else with whom Enberg spoke, would have believed that [plaintiff's] submission was an offer to sell something, which if used would oblige the user to pay").

Furthermore, given the Court's assessment of lack of substantial similarity between the works with respect to, <u>inter alia</u>, their respective plots, elements, and themes, which assessment is used to infer use, plaintiff has insufficient evidence of use by defendants of plaintiff's screenplay and/or the ideas therein.

Accordingly, summary judgment on plaintiff's state law claim is also appropriate.

## IV.  Conclusion

For the foregoing reasons, defendants' Motions for Summary Judgment [Docs. ## 96, 107] are GRANTED.  The Clerk is directed

to CLOSE this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut, this 30th day of May, 2007.**